*certain matters of marriage and family life. "The non-custodial divorced parent has no way to implement the constitutionally protected right to maintain a parental relationship with his child except through visitation. To acknowledge the protected status of the relationship as the majority does, and yet deny protection under Title 42 USC § 1983, to visitation, which is the exclusive means of effecting that right, is to negate the right completely. Wise v. Bravo, 666 F 2d 1328, (1981)"*

(end quote)

The bureaucratic checks and balances built into the justice system that are meant to protect people like myself and my daughter. That is why the Federal Court needs to hear this case, which does not fit any of the criteria for abstention cited by Judge Sheridan. All of the reasons cited by Judge Dawson for denying visitation are irrational. None of them have been submitted to a swift due process hearing.

This case needs to be heard. Judge Dawson is violating the constitutional rights of people who enter her court, a clear overreach of state judicial authority.

I am including in the packet the record from Dawson's Court from June 23, 2016 and my recent Affidavits requesting that I be allowed the basic human, constitutional right to contact with my daughter. I am also including the recent OSC requesting that she recuse herself, which, while filed on June 27, 2016, she has set to be heard on September 12, 2016.

I certify that all the statements I have made are true and accurate to the best of my knowledge.

*Affidavits from Dawson's Court included here have been filed with her since suspension of visitation.*

_____
Steven Whelan

6/29/16

At IDV Part of the Supreme Court of the State of New
York, held in and for the County of New York, at the
Courthouse located at 100 Centre Street, NY NY 10013
on the     day of       2016,

PRESENT:

Hon. Tandra Dawson

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------x
MEGHAN A. LOCKARD,
             Plaintiff,            Index No. 309298/15

      -against-               **ORDER TO SHOW CAUSE:**
                                               Hon .Tandra Dawson

STEVEN W. WHELAN,
             Defendant.
-----------------------------------------------------------x

**Upon reading and filing** the attached Affidavit of Steven Whelan, sworn to on June 23, 2016, with all the exhibits attached thereto, and upon all the pleadings and proceedings had herein,

**LET** Meghan Lockard, the Plaintiff herein, and/or her attorneys, appear and show Cause at the IDV Part of the Supreme Court of the State of New York County of New York, located at 100 Centre Street, Room 1604, NY NY 10013, on the       Day of       2016, at 9:30 a.m. of that day or as soon thereafter as counsel may be heard, why an Order should not be made and entered for the following relief:

1)     Grant application to renew and reargue the decision to deny the Defendant access to his child. Upon granting this application, it is requested that the Court grant

1

**Defendant immediate and regular access to his child.**

**For such other relief** as this Court deems just and proper.

**ORDERED** that service of a copy of this Order to Show Cause, together with the papers on which it is based, be served upon Plaintiff by her Attorney Jill Zuccardy, at 225 Broadway, suite 1515, NY NY 10007, by overnight mail on or before         and that such be deemed sufficient service herein.

ENTER:

_____
Hon. Tandra Dawson

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------x
MEGHAN A. LOCKARD,

          Plaintiff,                        Index No. 309298/15

    -against-                        **AFFIDAVIT**
                                             Hon. Tandra Dawson

STEVEN W. WHELAN,

          Defendant.
-------------------------------------------------------------x

       STATE OF NEW YORK    )

       COUNTY OF NEW YORK ) ss:

Steven W. Whelan, being duly sworn, deposes and states:

1.     I am the Defendant in this action. I am submitting this Affidavit as a motion to request that Judge Dawson recuse herself from presiding over this divorce action Index No. 309298/15. For various reasons, including the facts that she has violated my constitutional rights and that I am suing her in Federal Court for violating my constitutional rights, she is biased in this case. Besides the demonstrated partiality in her past remarks and rulings that I will describe in this Affidavit, as the defendant in her personal capacity in my Federal suit against her, where I am the plaintiff, she cannot be reasonably expected to remain impartial in this case.

2.     My former criminal counsel, Tajuana Johnson, informed myself and Paul Leavin that Judge Dawson's rulings are influenced by fear of criticism. Ms. Johnson said that, after

Dmitriy Kanarikov killed his son and himself in 2013, Judge Dawson ruled that a father who had not seen his child for months could only have supervised visits. It was a decision undeniably premised on fear of criticism, violating Section 100.3(B)(1) of the Administrative Rules of the Unified Court System and Uniform Rules of Trial Courts. Both Ms. Johnson and Mr. Leavin independently told me that judges in general, and Judge Dawson in particular, overly fear the risk of negative press. This fear of criticism has led Judge Dawson to violate both my own constitutional rights and those of my daughter without expedient due cause and based on groundless hearsay. Her fear of criticism makes her unfit to judge impartially, and she should accordingly recuse herself in my case. This concern over public image causing her to lose her job is furthermore a disqualifying factor under 100.3(E)(d)(iii). That disqualification factor will become more clear within the rest of this Affidavit, which shows that she her under-informed caution caused her to function as a tool of my wife's neurosis. As an egregious violation of human rights, Judge Dawson acted either out of neglect or fear to deprive one year old ▮▮▮ ▮▮▮▮▮▮▮▮▮ and her father a right to maintain contact and a relationship with each other. Our rights have been denied without any attempt at a swift due process hearing.

3. My criminal charge disposition has involved me pleading guilty to handing Ms. Lockard a baby shoe in violation of her Ex Parte temporary order of protection. The other charges have been dismissed. The series of accusations that Judge Dawson used to justify

suspension of visitation have not received expedient due process hearings and therefore my constitutional rights have been violated.

4. Judge Dawson has not only failed to consider the entirety of the court documents that pre-dated the case being moved to her court, she has not even read the Affidavits submitted to her Court. I could hear her say off the record at our first appearance in her Court in January to her clerk: "This is too much for me to read." After saying this, she handed all of the newest Affidavits to her clerk. Then, she based her decision to recommend supervised visitation on her partial reading and the arguments of our lawyers. My attorney was at a disadvantage because he had to appear by speaker phone, being in recovery from hip surgery. She remarked on the record, "I don't know what to believe." All of the material claims that led her to the decision to institute supervised visits have yet to be subject to or substantiated by any due process hearing. The absence of my lawyer biased Judge Dawson to accept the absurd claims of Ms. Zuccardy, including the Deyfus disproven claim that the house where I live is unsafe for my daughter to visit. While none of Ms. Zuccardy's wild accusations have been substantiated by any investigation, Judge Dawson has continued to act and speak as though all of Ms. Zuccardy's accusations are proven facts.

5. Despite all of the pre-existing data and new data from CFS that shows I am proficient in caring for my daughter AND that my family's East Brunswick, NJ home is baby

3

safe, Judge Dawson officially suspended visitation on April 1, 2016. There was no proof or even evidence of child abuse nor of neglect. There was no due process hearing on the reasons for this suspension. In ruling to suspend visitation, she said she was doing so until "the District Attorney got all of the accusations sorted out." In the event of suspension of parental contact, Federal Courts have ruled that it is a constitutional right for the parent to receive swift due process. It has even been ruled that waiting one month is too much of a delay in this regard. I have attached the documents detailing these violations that I submitted to Trenton's District Court. With the submission of these documents, I have initiated an action to sue Ms. Dawson in her personal capacity.

6.  At my criminal disposition hearing on April 23, 2016, Judge Dawson asked the District Attorney and my lawyer, Terry Brostowin, to approach the bench. She remarked that there are concerns about pedophilia. This is first of all slanderous as I have never been accused of pedophilia. Second of all, none of the criminal charges are even remotely related to pedophilia. Third, this shows a clear bias insofar as she has accepted unproven, uninvestigated, uncharged claims made by Ms. Zuccardy and Ms. Lockard. Furthermore, without explanation, Judge Dawson has denied any request to revoke the restraining orders in my daughter's name against me. There was never any logical justification for such a restraining order because I have

never harmed nor neglected my daughter, and yet Judge Dawson cannot be bothered to consider the fact of my case.

7. Additionally, the accusations that they made involved sexualized emails with lesbian pedophile incest sexual content and third party erotic literature links being sent to associates of Ms. Lockard. On the surface, these emails appeared to have been sent by Ms. Lockard, but, as Ms. Lockard points out in great detail in prior Affidavits, it was obvious to the recipients that she had not sent them. Just prior to this, I had received emails from Ms. Lockard (with bizarre characteristics similar to those detailed by Ms. Lockard when describing the sexual emails), that threatened to frame me and put me in jail indefinitely if I did not relinquish my rights to visitation voluntarily. These emails (also included in prior Affidavits) were likewise sent by indirect means (not using Ms. Lockard's email address). Also, they were so over the top in their aggression, including threats to kill me, that the credibility was likewise questionable. However, the threat to prevent me from having visitation came true by means of subsequent accusations AND Ms. Zuccardy went on to argue a motion to have me jailed indefinitely (another threat made in the emails I'd received). While it appears that Ms. Lockard meant what she said in the threatening emails, having acted on the threats already, she has argued in recent Affidavits that I must be delusional for believing what was said in those emails. Judge Dawson is facilitating the continuation of Ms. Lockard's ongoing abuse by ignoring the fact that Ms.

5

Lockard is abusing the system to hurt me from afar now that Ms. Lockard can no longer abuse me in our own home.

8. In an attempt to find out where the threatening emails came from, a friend who is knowledgeable about technology told me to run the sender's IP address through a geolocation website. He walked me through it step by step, and it showed that the email had been sent from Switzerland. I assumed that must have meant it was a hacker or fraudulent person, but then he explained to me that IP addresses can be manipulated and faked. The content of the threatening emails appearing to be from Ms. Lockard and, together with the subsequent series of events, constitute circumstantial evidence that Ms. Lockard was attempting to frame me to get what she wanted from Ms. Dawson's Court.

9. Nevertheless, Judge Dawson has ruled in favor of the Plaintiff based on what Ms. Zuccardy described in Court as, in a very questionable usage of the term, circumstantial evidence. As just described, actual circumstantial evidence points to Ms. Lockard as conspiring to frame me.

10. Knowing now that the Court will be seeing our couple's counseling records and her own psychological treatment records, Ms. Lockard has grudgingly admitted that she committed the physical abuse that led to my post-concussion vestibular disorder. I have had to have weekly treatments at a cost of $100 each for this disorder since November of last year. I

6

also have to spend at least an hour a day doing exercises that stimulate the deteriorated neurological systems. I never committed or threatened any violence towards anyone in my life, yet Judge Dawson is treating me as though I am a violent criminal with Ms. Lockard as the victim. Judge Dawson ignores Ms. Lockard's acknowledged violence. I have not re-written the details of Ms. Lockard's abuse in papers for Judge Dawson's Court because it is too traumatic for me to keep reliving the violent blows to my head. I explained my non-repetition in Affidavits submitted to Judge Dawson's Court, and indicated that the details are in a prior Affidavit submitted to Judge Sattler's Court. It would surprise me, since she does not even read the entirety of current Affidavits, if Judge Dawson went back and read about the horrible things that Ms. Lockard did, which included hitting me in the head while I was holding our infant daughter and, on another occasion, while she was holding our infant daughter. One would think that an impartial IDV Court judge would be concerned if someone had a history of being violent in front of her own child in such a way that the child was actually endangered.

11. Yet, when Judge Dawson has heard the word "felony" with regard to my charge, the content of which alleged that I had made phone calls without saying anything (it was classified as a felony because it was the fourth alleged contempt of court charge), she has visibly reacted with partiality. I was never even indicted nor am I going to be indicted because the District Attorney is dismissing the felony charges. Each mention of the word "felony" made

7

Judge Dawson's eyes grow wide. In conjunction with the fact that her decision to suspend visitation for these months would only be justified by abuse or neglect (which, I don't know if she realizes, I have never perpetrated nor am I accused of doing so), this implies that she believes I am guilty until proven innocent of a violent felony.

12. Perhaps Judge Dawson takes the multiple charges and laundry list of uncharged accusations as a preponderance of evidence. Federal Courts have nonetheless ruled that a preponderance of evidence does not justify taking away the rights of a child and parent to have a relationship.

13. Judge Dawson said, on April 1, 2016, that she was suspending visitation until the District Attorney sorted out the accusations made by Ms. Lockard and Ms. Zuccardy. On the record, she continued by saying, "[E]specially the charges involving child pornography." It is appalling to even be associated with those words, particularly because there never was any child pornography in the email links (though Ms. Lockard's and Ms. Zuccardy's Affidavits said there was, research shows that there actually was not). Regardless, I have not been charged with anything remotely resembling child pornography. In addition, Mr. Leavin and I have repeatedly stated in recent Affidavits the fact that there are no such charges and that the D. A. is, as such, not investigating. That was the stated condition upon which my suspension of visits was predicated: the conclusion of the D. A.'s investigation into the Plaintiff's allegations,

8

"especially" those relating to "child pornography." Mr. Leavin has been repeatedly asking the Court to consider the recent motions to reconsider visitation and has been repeatedly ignored. Judge Dawson has taken it upon herself to exact vigilante justice for an unfounded, uncharged, false claim made by Ms. Lockard and Ms. Zuccardy. Dr. Gerard's recommendation to continue the suspension of visits (detailed below in section 14) AND Judge Dawson's choice to continue the suspension of visits are predicated on these accusations that lack grounds for even initiating an investigation. The other justification, which is apparently secondary to Judge Dawson based on her use of the word "especially" quoted above, is the series of contempt of court charges. However, as already mentioned, Judge Dawson has given various indications that she is not even aware of the content of those contempt of court charges, information that would be useful when making a decision to deny the constitutional rights of a child and her father. None of the contempt of court charges involved anything violent or even menacing. All of the charges violate the spirit of the law which is to protect victims of violence, which I am and Ms. Lockard is not.

14. Ms. Lockard's and Ms. Zuccardy's same uninvestigated, uncharged, unproven, untrue claims were regurgitated as fact by Dr. David Gerard in his court-ordered MHS report. Judge Dawson took this recommendation, which came as a *non sequitur* at the end of his report, as validation of her decision to suspend visits. Dr. Gerard's report included much inaccurate

9

information, including a misrepresentation that I have not been actively engaged with Forestdale until the last couple of months, whereas I have been regularly engaged with them since July of 2015 (a fact that is verifiable in past documents from reports provided by Namgyal Gyalnor to Judge Sattler's Court, which neither he nor Judge Dawson are likely to have read). According to Mina Perez, with whom Dr. Gerard spoke, his report was a gross misrepresentation of what she told him. Dr. Gerard also questions Ms. Lockard's believability before concluding by justifying his recommendation with unproven accusations made by her that I deny. His logic, like Judge Dawson's, depends on assuming I am guilty until proven innocent.

15. These are only some of the most flagrant examples from our case whereby Judge Dawson has demonstrated partiality against me in her words and rulings. Based on accusations alone, and without a thorough knowledge of the facts relevant to the case, she has seen fit to prevent my daughter and I from seeing each other since March 23. To make such an extreme decision without providing a swift due process hearing concerning the accusations is the violation of constitutional rights that will be the subject of the case in the Federal Trenton District Court. Both because her actions have required me to sue Judge Dawson for violating my constitutional rights and because of the motivations behind her decision-making that have led me to sue her, I ask that Judge Dawson recuse herself from trying this case.

10

16. State judges act in their personal, not judicial, capacities when their rulings violate constitutional rights of citizens without due process. In the specific scenario of suspending the relationship between parent and child, the Federal Courts have asserted that this due process must be provided expediently in response to a particular case where the due process hearing took a month to begin. The psychological damage that alienation from a parent causes can never be recovered, so Judge Dawson is in effect abusing my daughter on a whim. Any explanation Judge Dawson might provide will necessarily depend on an incomplete understanding of the case. Maybe she does not have time to read and weigh everything. If so, she should recuse herself for violating Section 100.3(9)(a) for agreeing to overextend herself to the point where she cannot perform the adjudicative duties of her office. At our first hearing at her Court, she remarked on the record, glancing sidelong at the pile of prior documentation from the case, "I see you've had quite a lot of back and forth already" (sic.). This reinforces the possibility that her self-overextension prevented her from learning all of the facts of our case. It is impossible for her to be an impartial judge if she is only going to consider what little fraction of relevant information becomes available from what Ms. Zuccardy and Mr. Leavin happen to say in court, along with assorted pieces of submitted documentation she happens to read, specifically because those only present a small fraction of the story. If she does not have time to learn about my case before depriving myself and my daughter of our constitutional right to a relationship with each

other, she should not be hearing our case. Unquantifiable permanent psychological damage has likely already been caused for my daughter by being disallowed from seeing her father for three months. In the meantime, I have never hurt her, neglected her, nor would I ever hurt nor neglect her. This injustice cannot continue to be perpetuated in the name of an impartial justice system. Perhaps Judge Dawson can perform some feat of semantic acrobatics to justify her rulings. Nothing could convince me that she has ruled impartially, nor would any reasonable person with full knowledge of the case think that she has been impartial. The fundamental fact is that she has been partial and negligent in her rulings, violating both my daughter's constitutional rights and my own. If Judge Dawson has any integrity, she has to accept that she has erred, admit that she is unable to rule on this case impartially either because of time constraints or for some other reason, recuse herself, and meet me in Federal Court.

WHEREFORE, I respectfully request my application be granted, and for such other relief as this Court deems just and proper.

                                                                                      Steven W. Whelan

Sworn to before me this _____ day of _____, 2016.

_____
Notary Public

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------x
MEGHAN A. LOCKARD,
                Plaintiff,              Index No. 309298/15

    -against-                **AFFIDAVIT**
                                          Hon. Tandra Dawson
STEVEN W. WHELAN,
                Defendant.
-----------------------------------------------------------x

    STATE OF NEW YORK    )

    COUNTY OF NEW YORK ) ss:

    Steven W. Whelan, being duly sworn, deposes and states:

1.     I am the Defendant in this action. I make this Affadavit in response to the Affirmations in Opposition made by the Plaintiff and that of the lawyer of the Plaintiff, both dated May 3, 2016..

2.     My life circumstances have substantially changed from the time of the agreed-upon Stipulation delineating *pendente lite* relief and temporary child support dated October 14, 2015. I have had no income during that time and I have accumulated an increasing amount of debt, been unable to service my marital debt for multiple months, effectively ruining my credit and ability to borrow.

3.     While I have been actively trying to make money, various forces have prevented me from doing so. Due to the increasing neurological deterioration caused by the concussions Ms. Lockard gave me, I have been unable to work productively, subject to debilitating migraines, and I require weekly medical treatments that incapacitate me for between one and two days. These medical records have been furnished to the court and, as Dr. Gerard noted in his MHS

1

report, the vestibular disorder I have is only explainable as originating from head trauma (the Plaintiff violently struck me in the head on multiple occasions - this is not a new claim, and is independently verifiable by means of the subpoenaed couple's counseling records, with Ms. Lockard's psychological records, and her psychiatric records). Since I am unable to drive after getting my weekly treatment, my mother drives me. My mother also pays the $100 cost for each appointment. Concussions are known to result from head traumas of varying intensities. Although the Plaintiff forced herself into the room as I tried to hold the door shut while she screamed at me, cornered me, knocked me unconscious, and struck me brutally in the head multiple times over the ensuing year leading up to her post-partem psychotic break, her absurd claim to have hardly slapped me is immaterial. Her violence resulted in serious head traumas, and the damage is still incompletely healed after seven months of weekly treatments.

4. Were my disorder to have been left untreated, I would within a few years have gone blind and become unable to speak. When a vestibular disorder causes the inner ear to send incorrect information to the brain, the failure to synthesize that information with contradictory information from the eyes leads to a deterioration of areas of the brain associated with that synthesis. Luckily, I am being treated by a chiropractic neurologist who is an expert in the field and understands how to take advantage of neuroplasticity to regenerate brain functions. He both video-taped and documented the series of tests he ran to assess and diagnose me. When I first began treatment, Dr. Kiechlin admits, he thought my double vision was so severe to the point of being unresolvable. The double vision and my other symptoms (tinnitus, slurred speech, a stutter, a lisp, and migraines, to name a few) have been slowly lessening in severity. I still require at least several more months of treatment to undo the damage to my inner ear that was

caused by Ms. Lockard striking me in the head. However, my various stays in jail have caused me to miss doctor's appointments and made me incapable of doing my rehabilitating exercises. In this way, Ms. Lockard remotely continues her physical abuse by limiting my ability to heal.

5. Only now that I am noticing progress in my healing process do I have perspective on the severe nature of my post-concussion vestibular disorder. When I started treatment, I chose to get a new job with MassMutual, thinking that I would soon be able to overcome the limitations my neuro-degeneration had caused. I never had a cognitive impairment with regards to thinking nor writing, and so I was able to impress the interviewers with my intelligence and knowledge of the business. However, my disorder both directly and indirectly continues to impair my functionality and ability to generate business.

6. I live in my parents' home and my parents have exhausted their savings by supporting me and paying for Paul Levin. My mother gives me a check every month for the $909 I pay to Ms. Lockard, which comes out of the pension pension my mother receives as a retired teacher. I cannot invest in marketing or generating sales because of my destitution. I have not been able to service my debts for multiple months, and my bank account routinely overdrafts. I owe over $3,000 to my former employer, Prudential, due to recaptured commission from failure to complete business when my condition worsened, and that is going to collections. I owe over $500 to my new employer for the money that has been deducted from my empty paychecks for the last five months. A manager recently expressed concern to me about whether I will be able to make my quota for contract continuation due to the fact that I have not made any successful sales yet. Embarrassingly, I was forced to explain the ins and outs of my post-concussion disorder to this manager. As is shown on my most recent pay summary, I have

3

had no income and my contract continuation requirement by year end is $38,000.

7. At this point, considering Ms. Lockard's past violence towards me and follow-through on her emailed threats, compounded by Ms. Zuccardy rattling off absurd and evidenceless accusations, I feel unsafe all of the time. I have nightmares where I am trying to avoid contact with Ms. Lockard and she contrives ways to have me arrested. Whenever I am awakened by noises in my parents' house at night, I am worried that Ms. Lockard or someone she has hired is breaking in to attack me, and I with my adrenaline pumping I have difficulty settling back to sleep.

8. I do not know if it is cruelty or paranoia that are driving the Plaintiff's behaviors, but the reality is that I live in fear and avoid entering Manhattan unless I have to work or attend court. I have put an app on my phone that prevents it from even *accidentally* dialing Ms. Lockard's old phone number (Ms. Lockard told my mother on December 26 that she was changing her phone number, a fact recounted also in the recent MHS report, and I never learned her new phone number; she nonetheless makes claims that I have called her repeatedly on the phone a month ago and had me arrested). I keep my phone off when I'm not using it, fearing that Ms. Lockard will call and threaten me or taunt me as she has in emails. My guess is that Ms. Lockard and Ms. Zuccardy simply want me to give up in the divorce negotiations, but I care about my daughter too much to give up in the face of Ms. Lockard's threats and actions.

9. Up until the last time Ms. Lockard hit me in the head, which was in April of 2015, I was a productive employee. In the preceding months, I had set in motion several sales that led to my earning over $12,700. That fact, along with a list of my ensuing paychecks, is shown in Exhibit A. My income steadily declined and then ceased altogether, demonstrated by my last

pay statement from MassMutual. Ever since the failure of the deal for the commission that comprised most of the $3,723.54 paycheck from Prudential on 10/16/2015 (the deal fell through two weeks later), I have owed Prudential money.

10. I have no reason to not want to make money, and indeed that is why I have continued trying to make sales for MassMutual. It is embarrassing to try to make money and fail. When Ms. Zuccardy asked my projected annual income on the phone last summer, she laughed at me and was incredulous that I would make so little money. I do not want to be living in my parents' home, and I want to be able to support myself and my daughter. Between the full-time job of responding to court filings and being routinely immobilized by my vestibular disorder much of the time, I am in a very different life situation than I was during the months of last year and years prior when I earned an income. I continue to get migraines, though they are less severe. If I skip any of my hourly exercises, I start to feel dizzy, shaky, and nauseated. A relative of Ms. Lockard, who asked not to be named, told me in December that when Ms. Lockard describes my post-concussion disorder, she laughs at my suffering and makes jokes about it my brain damage.

11. I am not sure how my lack of income is linked, in Ms. Zuccardy's mind, to anything other than my vestibular disorder. In November of 2015, I began to get ceaseless, throbbing migraines emanating from the base of my skull. It escalated to be so painful that I could barely walk. I remembered I had had a migraine just like that one another time - the day after Ms. Lockard hit me for the first time, the time when I saw a flash of light and collapsed, I woke up with just such a migraine the following morning. When it recurred, the migraine was so overwhelming that I talked to my psychiatrist about it the next day, at which point the migraine