had not stopped or lessened in intensity. His eyes got big with fear and he told me I needed to see a doctor about the symptoms as soon as possible. I learned that the recurrence of symptoms that first appear after a concussion is common when the concussion has caused serious, lasting damage. Ms. Lockard admits to hitting me during that first incident in 2014, and it should be noted that the impact to the head necessary to cause a concussion is indeterminate and variable in general. I thought it would be wrong to break up with her over it because she was pregnant at the time and I knew she was remorseful the next day, taking me out to lunch. Ms. Lockard should remember that, before spending the day in Flushing after said incident in 2014, we spent a long time in the morning massaging my neck at the base of my skull because I had agonizing pain emanating from there that wouldn't go away. Dr. Vincent Kiechlin's examination details, already furnished to the Court, revealed that indeed I have a post-concussion vestibular disorder..

12. Before the end of November, I had just moved down to New Jersey, causing me to have an approximately two hour commute in both directions. It would be temporary, I reasoned at the time, and so I would keep my private office in Jackson Heights, Queens and move back to Queens once I started making money again.

13. However, my final paycheck, on 10/30/2015, is the last income I have received. After the recommendation from my therapist on 11/10/2015 to see a doctor, I learned that doctors of chiropractic neurology specialize in diagnosing and treating post-concussion disorders. Feeling as if I could do nothing other than lay down, I called my mother and asked her to find a chiropractic neurologist nearby so I could make an appointment. She found two on the internet, I picked Dr. Kiechlin, and made an appointment to see him the next day, November 11 (Exhibit B). As he was doing the coordination, vision, speech, and movement tests on me, a process that

took more than two hours, I began to realize the extent of my brain damage. He diagnosed me with a vestibular disorder, which is well known to be caused by head trauma. He was taken aback by the seriousness of my symptoms as he measured them, remarking at one point that I was doing as poorly as a drunk person on my coordination tests. Nonetheless, my ability to perform cognitive tasks impressed him (he had me walk forwards and backwards in a circle and down the hallway while counting backwards from 100 by subtracting 7 at a time, something he says most people fail at, and I didn't get one number wrong - this was one of the tests he video-taped and has on record). The reason my cognition had not been affected by my inner ear disorder is that the inner ear feeds its input about balance and movement with the areas of the brain that are relevant to coordination and vision, and so the problems that had been worsening over time surrounded my speech, coordination, and vision. I drove myself there to his Shrewsbury office that day, so when he started to give me a treatment and I became instantly dizzy, he said I should get a ride because I would be dizzy for up to two days after treatment.

14. I have a long, slow road to restoring my faculties. If I am able to continue my treatments and exercises, exercises which I have to do throughout the day to stimulate the deteriorated neuronal systems, I should be able to decrease the frequency of my treatments before the end of the year. Since my cognition was not impaired due to the concussions, I feel confident that, after healing the neurological systems associated with my spacio-temporal faculties, I will be able to be active and generate an income as I was before. At that time, I will gladly make the appropriate monthly transfers to Ms. Lockard's account from my earnings if ▮▮▮▮ is still living with her. I have mentioned in previous Affadavits that I believe Ms. Lockard should be paying for my treatment, if not additional damages. If the Plaintiff would prefer the

7

monthly $400 cost of my treatments be offset against child support, that would be fine with me.

15. Concerning claiming ▇▇▇ as a dependent on my tax return, I did not know that only one of us could claim her. My thinking was that, since we both provide financial support for her, we could both claim her as a dependent. Ms. Lockard and I never discussed who would claim ▇▇▇ as a dependent, and it will have to be discussed in future years. Perhaps we will alternate years, though changing life circumstances will need to be taken into account. I did my taxes by myself online and went by what the program told me to do.

15. The IRS could audit me if they choose, but would probably find that they owe me money. If anything, I underestimated my business expenses for 2015 (printouts of my checks written and some work-related invoices and receipts, along with an a representative monthly TIme Warner Cable bill of $131/month are should in Exhibit C - the expenses shown are not an exhaustive list, but the total of what I've provided is roughly $20,000. I did the calculation of car-expense-related deductions such as gas and depreciation on a software program, not on paper, for example. I am not sure why it would be necessary for me to comb through my records for my other receipts again as I did when I did my taxes, and I would think that these most easily accessible examples would suffice. Vanessa Espin was my assistant). As Ms. Lockard and Ms. Zuccardy could easily see in the joint 2014 tax return, my 2014 unreimbursed business expenses were $17,803. I have to spend a lot of money on marketing for work. Since I rented a private office and hired an assistant in April 2015, my business expenses of course increased in 2015. When reviewing the child support calculation worksheet, I hadn't noticed in September that the unreimbursed business expenses were not included on the child care cost sheet. Since Ms. Lockard's were not included either, the form was not filled out correctly. Ms. Zuccardy gives a

8

questionable explanation for excluding these subtractions, and it would be especially difficult to justify considering the fact that the child care cost associated with daycare tuition this year was linked to my income net of business expenses. The daycare used my bottom line ~$20,000 income net of business expenses in 2014 when calculating our daughter's tuition for the current contract. At the time we agreed to the *pendente lite*, I had felt that $909 was a reasonable number to provide each month, but then my income disappeared when my vestibular disorder worsened.

16. I satisfy the condition described by Ms. Zuccardy in item 9 of the Affirmation in Opposition that needs to be shown to justify reduction of *pendente lite* support that I am unable to meet my own needs. I've had no income since October 2015, and I've only been able to pray that I can start making money again or that my parents will have enough money for me to meet my basic obligations. Some months, my father does not get paid and both of my parents have to rely on my mother's income alone, under which circumstance they would need to get a loan from someone else to give me the $909.

17. In section 23 of her response affirmation, Ms. Zuccardy argues that any money I get from my parents should be considered income. I would want to know more specifically the method of determining that and by what criteria it would be assessed. If that is going to be the method of calculation, the *pendente lite* support would most likely wind up lower than the suggested $586. Furthermore, several large periodic deposits from family on Ms. Lockard's recent banking statements should also be considered.

18. In previous discovery exchanges, we had requested that the Plaintiff furnish more recent bank statements. This was multiple months ago now, and we still have only received the

9

Plaintiff's bank statements through November of 2015. The oversight is likely intentional.

19. The vast majority of my share of the marital debt was accumulated by cash advances on credit cards used for the purpose of paying rent on the marital apartment. Whenever I told Ms. Lockard that I was going to have trouble paying the rent on a given month, which I did several times, she would respond, "You'll pay it or you'll be in trouble," threateningly. I am not sure why she did not want to listen to or believe me, but, fearing her violent temper, I chose to get cash advances from credit cards to pay the rent on the marital apartment when I could not afford to from my income. Ms. Lockard refused to contribute to the rent even though I told her on several occasions that I would need help paying the rent. As a result I accrued a massive amount of credit card debt during our marriage. My credit will continue to worsen until Ms. Lockard pays her portion of the marital debt, although the continued forestalling on the Plaintiff's side is close to pushing me to file Chapter 7 bankruptcy. I am several months behind on payments for multiple cards, owing thousands of dollars in back payments. In the summer of 2015, my FICO credit score was hovering around 600. Now it is under 495.

20. Not putting the credit card debt on the first draft of the SNW was an oversight. The debt accumulated during our marriage, as can be seen by statements that show the zero balance during our marriage and large balances at the time I was served with divorce papers. The statements for the last couple years of all the cards were provided in discovery early this year, whereupon Ms. Zuccardy realized her client's liability and starting making offers to settle the money disputes amicably. She tried to avoid debt question, and when it came up she became totally silent on the subject of money.

21. Furthermore, Ms. Lockard took all of our marital furniture without warning when

she moved out of the marital residence in June of 2015, and the replacement cost is well over $20,000. This represented by far the largest capital outlay we made during our relationship, and the reason for doing so was that it was that it was furniture capable of lasting our entire lifetime. I believe the furniture should be valued at replacement cost for the purposes of the divorce since I will have to pay the full replacement cost in order to get furniture of comparable quality. Various offers have been made to give me pieces of furniture, give me $5,000, or give me some other amount of money to put this question to rest. Every offer has been rescinded, and meanwhile I am drowning in marital debt. I would like to see an expeditious resolution to the money questions for this and other reasons mentioned above.

22. I did not yet request a decrease of the $456 monthly contribution to child care because the daycare tuition last year was linked by the daycare. I am not sure if the tuition has changed or will changed, nor do I know if my 2015 tax return was used in the re-contracting. My lawyer asked the Plaintiff's lawyer to let me be involved, but she said the did not want to involve me. Apparently, Ms. Lockard entered into a new contract without my input. Unless Ms. Lockard or Ms. Zuccardy object, I would like them to furnish me with a copy of the new contract. Also, I ask that the Court consider reducing or eliminating the monthly child care amount until I have income.

23. Concerning the allegation that I should list the marital car on my statement of net worth, the title was signed over to my father because I never repaid him the money I borrowed to purchase it. In addition, GEICO assessed that the cosmetic damage to the car would cost more to fix than the value of the car itself (check from GEICO shown as Exhibit D). It also needs work on the exhaust system. Lastly, I did not know that there is a difference between alimony and

child support, and as a result I made the mistake described by Ms. Lockard on my tax return. I will certainly educate myself about that and other issues before doing next year's taxes.

## RESTORING VISITS WITH MY DAUGHTER

24. Extended periods of separation from a parent leads to emotional problems to emerge later in a child's life, including but not limited to inability to form close relationships and self-destructive behaviors. This is widely known and understood, yet Ms. Lockard, even while knowing about the psychological damage she is doing to our daughter, wants to hurt me so much that she does not care if she hurts our daughter.

25. The prolonged, unjust separation from my daughter, whom I love with all my heart and only want to protect, is difficult to bear. I am constantly feeling heartbroken, missing Willa and saying prayers for her. It is especially painful that my parents and aunts and uncles still have not gotten to celebrate Christmas with her (CFS recommended not giving gifts at their facility), that I have not seen her since March and it is now May. I never hurt my daughter nor my wife, and yet I am being treated even more severely than a violent criminal by having my visits cancelled altogether. The symptoms of my post-concussion vestibular disorder are agonizing on their own, and are exacerbated by both the stress of fear of what Ms. Lockard will do next and the anxiety of separation from my daughter. Sometimes, before my weekly treatment, my blood pressure is dangerously high (it increases when my other symptoms worsen).

26. The MHS doctor mis-transcribed various details of our accounts, most

12

importantly writing that I was physically violent with Meghan at some point. He mentions this at the point in the interview where it was time to ask, and then does not go into any detail (he would have asked follow-up questions). Combined with the facts that I never was physically violent towards Ms. Lockard nor does claim that I ever was, my guess is that he mis-read his scribbled notes or mis-typed them. However, his conclusion that I should not have visits with Willa is phrased as a logical derivation of the existence of the alleged criminal charges and the fact that I have been violent in the past. This recommendation is therefore built on a typographical error. Meanwhile, CFS is ready and willing to host visits, my family is willing to accompany me if requested, Deyfus and ACS have validated that my parents' home is safe for visits, and Forestdale's caseworker Namgyal Gyalnor reported observing me with Willa and feeling I was fathering appropriately. There is no substantial reason to conclude that I should not be continuing to have visits with my daughter.

27.   Ms. Zuccardy made that I sent the sexually explicit emails and links to literary erotica, and it was said in court that the district attorney should disprove those claims before visits are resumed. However, I am not being charged by the district attorney with sending those emails and, on the surface, they appear to have come from Ms. Lockard's email account, whereas her Affadavit on the matter argues they are not from her. Effectively, attributing those emails to me is a hollow, unfounded accusation. The DA is, accordingly, not pressing charges to that effect.

28.   I attended a visit alone with ▇ at CFS after accidentally passing Ms. Lockard in the hall the week before. Even though ▇ was in a bad mood because she was teething, I handled her well and she was having fun eventually, at Mariah Ely described in her report. I did

13

not attempt to encounter Ms. Lockard nor do I have any interest in doing so outside of future court orders (i. e., handing off ▓▓▓ before and after visits in the future).

29.     Ms. Lockard either told Dr. Gerard that ▓▓▓ fell off a chair once while in my care, or he mistranscribed it. This did not happen, and it is characteristic of the various misrepresentations Ms. Lockard makes repeatedly. I have never endangered ▓▓▓ nor have I ever hurt her in any way. For all of these reasons I ask that either my visits are resumed OR at least for some explanation be provided of what the Plaintiff and her counsel are worried would happen if I have visits. All that is being accomplished by disallowing visits is to hurt Willa psychologically in the long run and to hurt me. I never did or said anything that would justify cancellation of the visits. I deserve to either have visits with my daughter or to be given a clear explanation of what specific danger the Plaintiff fears. The fact that Ms. Zuccardy refuses to explain what they are afraid of when asked by my lawyer, Mr. Leavin, shows that the Plaintiff does not have a reasonable concern but is denying visits out of spite as part of a custody grab. Ms. Lockard claims again in the MHS report that she went insane because of me. This patently absurd considering that she had struggled with depression since childhood and her depression is being treated with psychiatric medicines. By the logic of her claims, while the Plaintiff and I do not live together, somehow I am continuing to cause her to have a chemical imbalance that needs to be medicated. According to psychiatric literature, if one person blames another for a mental breakdown, it is a sign that the psychological root of the breakdown is lingering.

30.     Because the justifications for disallowing visits are unsupported, I request immediate relief from the Court including the resumption of visits with my daughter. In no one's informed professional opinion is there any reason for me not to spend time with my daughter,

14

and it is in fact damaging psychologically for ███ in the long term to sustain this suspension of visits. Again, I have never committed any violence towards anyone, threatened any violence towards anyone, nor am I accused of doing so, nor am I thought to be capable of doing so.

31. Also, considering my dire financial situation, I request that the Court expeditiously make a decision on the re-assessment of *pendente lite* support. Ms. Lockard stole essentially all of our marital assets without warning leaving me saddled with debt, and meanwhile I lost my ability to make money due to the concussions I received at her hands. Lastly, I request expeditious consideration that Ms. Lockard should be made to pay, in arrears and going forward, for the medical treatment that I have required due to the concussions she gave me as a physically abusive spouse.

WHEREFORE, I respectfully request my application be granted, and for such other relief as this Court deems just and proper.

Steven W. Whelan

Sworn to before me this        day of         , 2016.

_____
Notary Public

**EXHIBIT IN SUPPORT OF EMERGENCY MOTION**

As a counter-argument to Judge Sheridan's suggestion that I should either file an OSC in Judge Dawson's Court or go forward with some kind of state appellate court procedure, I present these statements that indicate it is too much too ask of a parent. These are from Whisman v. Rinehart. All of the cases cited here and elsewhere involved situations where there was ACTUAL concern about child safety. In my divorce case, however, there is nothing but IMAGINED concern.

Whisman v Rinehart

"Even if defendants had a right to take temporary custody of Joel, defendants had a corresponding obligation to afford Michelle and Joel an adequate post-deprivation hearing. Doe v. Hennepin County, 858 F.2d 1325, 1329 (8th Cir.1988). The right to an adequate post-deprivation hearing was clearly established in February of 1995. Defendants scheduled the hearing for March 15, 1995, nearly a month after taking Joel into custody. Further, defendants objected to an earlier hearing, claiming administrative inconvenience. Michelle's and Joel's first opportunity for a due process hearing was seventeen days after Joel was taken into custody. Under the facts of this case, seventeen days was not a prompt hearing.

Defendants contend that plaintiffs could have obtained a lawyer and availed themselves of certain procedural remedies at an earlier time, thus satisfying their right to due process. We cannot accept this contention. There may be some analogy in observing that any person whose clear constitutional rights are violated has the right to later employ counsel. When the state deprives parents and children of their right to familial integrity, even in an emergency situation, without a prior due process hearing, the state has the burden to initiate prompt judicial proceedings to provide a post deprivation hearing. Weller v. Dep't. of Soc. Serv. for Baltimore, 901 F.2d 387, 396 (4th Cir.1990). The Second Circuit held, in Duchesne v. Sugarman, 566 F.2d 817, 828 (2nd Cir.1977):

In this situation, the state cannot constitutionally "sit back and wait" for the parent to institute judicial proceedings. It "cannot [adopt] for itself an attitude of 'if you don't like it, sue'?" The burden of initiating judicial review must be shouldered by the government. We deal here with an uneven situation in which the government has a far greater familiarity with the legal procedures available for testing its action."

```
                                              RECEIVED
                                              JUN 2 9 2016
   SUPREME COURT OF THE STATE OF NEW YORK
                                              AT 8:30_____ M
   COUNTY OF NEW YORK           PART IDV       WILLIAM T. WALSH
   ------------------------------------              CLERK

   MEGHAN LOCKARD,                             Index No.
                                               309298/2015
              PLAINTIFF

              -VS-

   STEVEN WHELAN,                              CONFERENCE

              DEFENDANT
   ------------------------------------
                        June 23, 2016
                        100 Centre Street
                        New York County

   B E F O R E :



                        HONORABLE TANDRA L. DAWSON
                        JUSTICE OF THE SUPREME COURT


   A P P E A R A N C E S :

                        FOR THE PLAINTIFF
                        JILL ZUCCARDY
                        New York, New York


                        FOR THE DEFENDANT
                        PAUL LEAVIN
                        325 Broadway
                        New York, N.Y.




                        AMALIA HUDSON
                        OFFICIAL COURT REPORTER
```

## PROCEEDINGS

1  THE CLERK: Number one on the matrimonial calendar,
2  the matter of Meghan Lockard and Steven Whelan.
3  Sir, please stand. Raise your right hand. Do you
4  solemnly swear or affirm the statements you make before this
5  Court will be the truth, and nothing but the truth so help
6  God, or do you so truly affirm?
7  MR. WHELAN: Yes.
8  THE COURT: Please state your name.
9  MR. WHELAN: Steven Whelan.
10  THE CLERK: Ma'am, raise your right hand. Do you
11  solemnly swear or affirm the statements you make before this
12  Court will be the truth and nothing but the truth so help you
13  God, or do you so truly affirm?
14  MS. LOCKARD: I do.
15  THE CLERK: Thank you.
16  Counsel?
17  MS. ZUCCARDY: Jill Zuccardy, Z-U-C-C-A-R-D-Y
18  appearing for Meghan Lockard. Good morning.
19  THE COURT: Good morning.
20  MR. LEAVIN: And Paul Leavin, L-E-A-V-I-N, 325
21  Broadway, New York, New York for Ms. Whelan, Good morning.
22  THE COURT: Good morning. All right. So these
23  matters are on -- One motion is on for oral argument, Motion
24  Sequence 4. With respect to Motion Sequence 3, a hearing
25  just needs to be scheduled for the family offense. You're

PROCEEDINGS

1   seeking an order of protection?

2   MS. ZUCCARDY: I had noted, I believe, the motions
3   were resolved in Sequence 4. I am sorry, Your Honor. I will
4   look.

5   THE COURT: Please check.

6   (Pause in proceedings)

7   MS. ZUCCARDY: Yes. You're right, Your Honor.
8   Three needed a hearing.

9   THE COURT: We'll schedule a hearing on 3. What
10  did you have for 4?

11  PROSECUTION: Four was the support motion,
12  Mr. Leavin's motion, which was on for argument.

13  THE COURT: Oral argument.

14  MS. ZUCCARDY: I don't know what Mr. Leavin's
15  recollection is.

16  MR. LEAVIN: Yes. That's my recollection. I would
17  ask that the Court dismiss the request for a contempt hearing
18  on the grounds that in the interest of justice Mr. Whelan's
19  alleged violations have been resolved and litigated in the
20  criminal situation; and it would be unfair and redundant to
21  have a hearing on the civil side when all this has been
22  resolved on the criminal case.

23  THE COURT: That's denied. As you know, parties
24  are legally able to proceed both civilly and also criminally
25  with respect to these types of actions. So that is not any

PROCEEDINGS

1    excuse recognized in the law for dismissing a case. And also
2    there are different allegations in Motion Sequence 3 than
3    there are in the criminal case.
4        MR. LEAVIN:  Okay.
5        THE COURT:  So we'll just set that down for trial,
6    and are you ready on your oral argument on the Motion
7    Sequence 4?
8        MR. LEAVIN:  Yes.
9        There are a few elements of relief that we're asking
10   for, Judge. The first is to reduce Mr. Whelan's basic child
11   support to 130 a month based on a substantial change in
12   circumstances which were clearly articulated in our papers.
13   Ms. Zuccardy filed opposition. We filed a reply and then
14   after that Mr. Whelan submitted an affidavit which was set to
15   Ms. Zuccardy — she didn't respond to that — stating that he
16   lost his job for circumstances that are stated in his
17   affidavit. So he has now no job, no income, no health
18   insurance. He is currently looking for work. But as a
19   financial adviser, it would be very hard for him to get work
20   because of the charge. The felony allegation is now part of
21   his records in the financial industry even though he is
22   pleading guilty to a misdemeanor and the fact that his credit
23   has been very damaged for reasons that are in his affidavit,
24   moving affidavit. And this is not through any fault of his
25   own. So his argument is there has been a substantial change

Case 1:16-cv-09443-PGG-SN   Document 1-4   Filed 12/07/16   Page 16 of 20
Case 3:16-cv-02948-PGS-LHG   Document 6-1   Filed 06/29/16   Page 5 of 24 PageID: 73

5

PROCEEDINGS

1   in circumstances. The 130 a month is based on his last
2   year's income. Had I known at the time that he lost his job,
3   I would have asked for an even further reduction. But I
4   would argue that the 130 a month reduction is appropriate
5   given the circumstances, the financial circumstance that have
6   changed since the 130 -- the other amount was agreed to last
7   fall.
8       Secondly, what we are asking for is the child here --
9   ▮▮▮ has not seen her father, has not had any contact with
10  her father for three months. So what we are asking for is in
11  her interest and in the interest of my client that the
12  regular unsupervised scheduled of contact be resumed.
13      As you know, there have never been -- the allegations he
14  is pleading to that are alleged are allegations against the
15  mother, that he harassed her; that he sent her emails; that
16  he did a laundry list of things which he is pleading to in
17  his misdemeanor plea. But he never hurt the child. He never
18  neglected the child. He is very careful with the child and
19  that's why -- and desperately wants to see her. He wants to
20  have a regular visitation schedule with her, and he wants to
21  resume the twice-a-week visits to her daycare program on
22  Rockefeller University Campus where there has never been a
23  problem with that. So that's the second element of relief
24  that we're looking for.
25      The contact with the child, we ask that that start

PROCEEDINGS

1   promptly. And the 130-a-month reduction of basic child
2   support we ask that it be retroactive obviously to the date
3   of the application.
4       THE COURT: Go head.
5       MS. ZUCCARDY: Your Honor, the Motion Sequence 4
6   dealt exclusively with the issues of finances. We can
7   address that first. It's true that we received a reply
8   affirmation after the last court appearance. It was
9   extensive and went well beyond the opposition. We then
10  received another yet affidavit submitted apropos of nothing.
11  And I did not file any papers because there is no mechanism
12  by which I can file papers without leave of court and I
13  respect that. So I didn't file a surreply. I don't ask to
14  now, but I'm just explaining to the Court why I didn't
15  respond because there is no mechanism for me to respond.
16      With regard to the substance of the motion, Mr. Whelan
17  entered into the Pendente Lite order freely and with
18  knowledge of his finances. At the time, he says that the
19  substantial change of circumstances, which is now post the
20  filing of the motion, is that he doesn't have a job. He
21  claims that that is not through any fault of his own known
22  which I would argue is ludicrous.
23      The violations of the order of protection that lead to
24  the five arrests were based on -- were the result of his own
25  affirmative behavior in violating the orders of protection.

Case 1:16-cv-09443-PGG-SN   Document 1-4   Filed 12/07/16   Page 18 of 20
Case 3:16-cv-02948-PGS-LHG   Document 6-1   Filed 06/29/16   Page 7 of 24 PageID: 75

7

**PROCEEDINGS**

1    Also, Your Honor, I would note that at the time that
2    Mr. Whelan entered into the Pendente Lite award, it was based
3    on a representation that he was earning, for child support
4    standardized perhaps, $32,000.
5    Mr. Whelan's criminal activity may foreclose him from
6    working in the financial industry. But it can hardly be said
7    there are no job opportunities available for an educated
8    person with a Master's degree that would earn the same if
9    not, you know, $32,000 a year which is what the award was
10   based on.
11   We also have no proof that he is seeking employment of
12   any sort. It's not really clear from the papers whether it's
13   the criminal -- he is alleging it's criminal activity, or
14   some sort of medical event that is keeping him from working.
15   I would propose that if it is a medical event that he should
16   promptly apply for social security disability so his child
17   had some income.
18   In terms of -- he says in one of his affidavits that his
19   impovished state is the result of, "Ms. Lockard took the vast
20   majority of our marital assets for herself." This household
21   had three assets, furniture, a car, and Mr. Whelan's
22   retirement. My client took furniture. Mr. Whelan took the
23   car, which he proceeded to have a car accident and got paid
24   $4,000 -- $3800 and he pocketed that money. The retirement
25   asset was liquidated to pay Mr. Whelan's rent arrears.

PROCEEDINGS

1   So I bring this up to say that Mr. Whelan makes
2   statements out of the air that has no basis in reality.
3   There was no vast majority of resources. And the only one
4   that did exist that could be liquidated he took. So
5   statements like that give — color the entirety of his
6   representations about his finances.
7   In terms — so we argue that the Pendente Lite order
8   which was based on income of the $32,000 should not be
9   reduced at this time. Mr. Whelan should promptly retain a job
10  search log in all areas which he might be able to earn that
11  income again.
12  In terms of the visitation issue which is not part of
13  the motion but which certainly is before the Court, what is
14  extremely troubling in this case, and continues to be
15  troubling as recent as the submission that Mr. Whelan made on
16  June 9th, is that he takes absolutely not responsibility for
17  any of his behavior. And that gives my client great pause
18  about whether it's going to continue.
19  After the last court date, Mr. Whelan did not contact my
20  client, but he began a series of emails contacting me.
21  THE COURT: Sorry. You said he began contacting
22  you?
23  MS. ZUCCARDY: Contacting me. I am assured by his
24  criminal defense attorney that this contact will stop, but I
25  want the record to be clear that after the last court date I

**PROCEEDINGS**

1   received an email from Mr. Whelan directly to me on May 10th
2   -- actually let me withdraw that. I received a cc on an
3   email May 10th which said that, "If Jill and Meghan want to
4   distort the meaning of neurological issues that resulted from
5   Meghan hitting me in the head, they can go fuck themselves
6   and never get off."

7   He cc'd me on that and I've asked Mr. Leavin to instruct
8   his client not to cc, pass messages through him. I wound up
9   with an email directly from Mr. Whelan at 1:47 in the morning
10  on May 11th -- Sorry 1:28 a.m. May 11th that said, "Get a
11  hold of your self-righteousness Jill Z." And then I received
12  another email from Mr. Whelan directly at 1:47 in the morning
13  in which he said, quite frightening to me, "Whatever victory
14  you might get is pyrrhic in this situation. I realize that
15  you're cozy there on Carroll Street," which is my home
16  address.

17  In one of the emails he talks about, to me directly, he
18  says that I'm going to be the subject of a civil suit. "I
19  guess you smell blood in the water, but I think you're
20  mistaken about whose it is."

21  This happened in May and has not happened since. His
22  criminal counsel has assured me it will stop, but it's very
23  troubling that even after we were in court he still, whatever
24  compulsion he has, whatever is going on with him, the
25  behavior continued. And that gives my client great pause