PROCEEDINGS

1    about his judgment, his mental health.
2         And, therefore, in terms of visitation, we are asking
3    the Court follow the recommendation of Mental Health Services
4    which was that visitation not be resumed until such time as
5    he demonstrates a willingness and an ability to abide by
6    court orders of protection -- which he hasn't violated since
7    the last court date. So that is good -- and demonstrates
8    understanding of the detrimental effects his actions have had
9    upon ███████, Ms. Lockard, and the childcare staff of
10   Rockefeller University. To this day he does not understand
11   that the childcare staff at Rockefeller University does not
12   want him there.
13        Actually I will say, Your Honor, I just said he hasn't
14   violated the orders of protection since the last court date.
15   I would maintain that the emails that he sent to me are third
16   part contact although he expressly says in his email that,
17   "This is not a third party communication to Meghan. It is a
18   direct communications to you, Jill Zuccardy."
19        So he is still trying to find ways to violate the order
20   of protection as recently as May. So for those reasons, we
21   oppose the resumption of his petition at this time until
22   Mr. Whelan is engaged in mental health services and shows
23   some acknowledgment of behavior and it's effects on Ms.
24   Lockard and their child.
25        MR. LEAVIN: Judge, if I may.

11

PROCEEDINGS

1     Mr. Whelan obviously accepts responsibility for having
2 violated an order of protection in his guilty plea on the
3 criminal case. So I think that is totally wrong. He's
4 agreed to go into a program as you just heard. He's pled
5 guilty. He will have a criminal record for a misdemeanor.
6 So he's certainly accepted responsibility for criminal
7 behavior.
8     Secondly —
9         THE COURT: He hasn't pled guilty yet. He will —
10         MR. LEAVIN: He will.
11         THE COURT: — according to what I —
12         MR. LEAVIN: He has indicated that he will, and the
13 People have accepted his guilty plea on the terms —
14         THE COURT: And he hasn't entered a program yet?
15         MR. LEAVIN: Right. Also we have no opposition to
16 him starting a job log search, a search for jobs. He didn't
17 have time. I didn't have time to have him prepare for the
18 Court the efforts he's made so far. He is looking. He's
19 sending out resumes, he's told me, to banks. He's looking
20 into working on a book with someone. So he is continuing to
21 search for jobs in the financial industry and outside as a
22 Financial Analyst.
23     I still didn't hear from Ms. Zuccardy any injury or
24 damage or threat or problem to the child.
25         THE COURT: Well, I was going to address that.

**PROCEEDINGS**

1       MR. LEAVIN: So the emails that he sent to Ms.
2   Zuccardy were in an emotional state. He's absolutely no
3   threat to her. The reason that he talked about her address
4   is because when he was pro se they had much communication
5   directly before I came on the case. He knows her street
6   because she told him. He absolutely will never, and as I
7   told her, he never would go there. He said he would never go
8   there. I told him — told her he said he would never go
9   there. So I think that is a red herring.
10      The main thing is and his problems with working are both
11  due to the symptoms, neurological symptoms he describes in
12  his paper and the fact of the criminal felony charge, not
13  even a misdemeanor plea, which is now in the financial
14  industry in his profile, in his FINA, in forms of the
15  financial industry. So that is a problem for him. But as to
16  the child, he has never done anything neglectful, abusive,
17  harmful, nasty, uncareful with the child; and I think for Ms.
18  Zuccardy to so say because he sent her an email he's a danger
19  to the child, I think that is absurd.
20      So I would ask the visits be resumed. If Your Honor
21  wants to first for a short period of time, resume supervised
22  visits where nothing conceivably can happen to the child then
23  I think it's the child's right and his right to at least
24  resume supervised visits because there is no reason not to do
25  that. There is nothing that can happen to the child in a

PROCEEDINGS                                          13

1    supervised visit. Thank you.
2         MS. ZUCCARDY: Just briefly in response, Your
3    Honor, in terms of the acknowledgment of wrong doing in his
4    affidavit dated June 9, 2016 Mr. Whelan says, "I explained I
5    am pleading guilty to handing a baby shoe to my wife in
6    violation of the restraining order. I have to plead guilty
7    to it because I admitted it to the arresting office." That's
8    his admission of wrongdoing.
9         He is still in our view not taking it seriously. The
10   emails that he sent to me in an emotional state that is the
11   exactly problem. Mr. Whelan seems to act very often in an
12   emotional state. So he is unpredictable, and something can
13   happen in a supervised visit.
14        MR. LEAVIN: I just started to read the hospital
15   record from a year ago where Ms. Lockard contrary to what Ms.
16   Zuccardy is arguing to the Court admits that she was violent
17   toward her husband — this is before her hospitalization —
18   that she punched him in the face. That she felt guilty about
19   being a bad mother. I mean I haven't finished these records,
20   but I just got them. Ms. Zuccardy had them for a number of
21   time. And they're inconsistency with her portrayal of
22   herself as a saintly mother and he is the devil. So once we
23   get all the medical records and counseling records, I submit
24   that the Court will get a more balanced picture of this
25   relationship and of these two people.

**PROCEEDINGS**  4

1   THE COURT: So your client is not engaged in any
2   services at this time. Is that correct?
3   MR. LEAVIN: He sees a psychiatrist, Judge.
4   THE COURT: How long has he been seeing a
5   psychiatrist?
6   MR. LEAVIN: A year and a half.
7   THE COURT: So it predated the allegations in all
8   of these petitions, his seeing a psychiatrist?
9   MR. LEAVIN: Right. And he was seeing a social
10  workers at Forestdale in accordance with agreements the
11  parties made prior to your seeing the case. He was still --
12  THE COURT: Has he been drug tested recently or
13  every.
14  MR. LEAVIN: He's periodically tested, and they've
15  all been negative. He's never had a positive alcohol or drug
16  test.
17  THE COURT: Have those results been turned over to
18  me. I am not aware of any negative drug test. Who is he
19  being tested by?
20  MR. LEAVIN: In -- Forestdale is the agency. I
21  don't know anymore details than that.
22  THE COURT: It says in the mental health eval. that
23  a previous toxicology screening from February 12th indicated
24  the presence of alcohol metabolites. He claimed he had used
25  cough medicine, but he did not reveal this until after the

PROCEEDINGS

1   results were received.  And he also had earlier tested
2   positive for amphetamines which he explains was due to his
3   use of Adderall.
4        MR. LEAVIN:  He has a prescription for Adderall.
5   And according to him there was seven tests.  One test was the
6   cough medicine allegation.
7        THE COURT:  Also contrary to your assertion that
8   he's never harmed the child in any way, in the same mental
9   health eval. it says that he went to a hospital and appeared
10  drink to hospital staff.  He smelled of alcohol and was
11  stumbling.  He also tried to prop up five-month-old Willa who
12  wiggled and fell off the couch.  Hospital staff took her to
13  the pediatric ER and reported Mr. Whelan's behavior to Child
14  Protective Services.
15       MR. LEAVIN:  Judge, as is on the record when
16  Mr. Whelan met further with ACS, submitted documents and
17  explained the situation, that report was considered, was
18  overturned, was reversed, and was considered sealed as
19  unfounded.
20       THE COURT:  What does that mean?  That these facts
21  never occurred?  The child didn't fall off of the couch and
22  he was not drunk with Willa in the hospital?
23       MR. LEAVIN:  That's only what Ms. Lockard said.
24       THE COURT:  Ms. Lockard wasn't there.  Wasn't she
25  admitted to the hospital?

PROCEEDINGS

1    MS. ZUCCARDY: Yes.

2    MR. LEAVIN: What she said to ACS subsequent. He
3  said three hours before he had dinner and had one beer. And
4  now the allegation -- the ridiculous allegation is that he
5  was drunk three hours later.

6    THE COURT: This is odd then. Here is another
7  example that supports Ms. Zuccardy's theory that he doesn't
8  take responsibility because in here it says that, "He
9  appeared drunk to hospital -- according to hospital staff."
10  Let me just see here.

11    MR. LEAVIN: Judge, ACS in their reversal of these
12  conclusions he was never tested for alcohol when at the
13  hospital when he supposedly was holding ▆▆▆. He was never
14  tested. And based on all of the evidence ACS reversed this
15  finding -- these allegations.

16    THE COURT: So the recommendation, according to the
17  mental health eval., which is just one of the considerations
18  by me, is that based upon his disregard of interpersonal
19  boundaries even while under court order, there is justifiable
20  concern that he may act inappropriately with his daughters.

21    "At this time, it is not recommended that an observation
22  of the interaction between Mr. Whelan and ▆▆▆ occur given
23  his propensity to violate the orders of protection and the
24  sexualized nature of emails that he apparently has sent to
25  Ms. Lockard and the childcare staff. Suspension of visits

PROCEEDINGS

1  same warranted at this time."

2  MR. LEAVIN: Judge, he was never even charged

3  criminally with sending any explicit sexual emails which he's

4  denied from day one.

5  THE COURT: I understand.

6  MR. LEAVIN: And it make no sense to me --

7  THE COURT: I understand. I acknowledge that he

8  hasn't been charged. And also I don't believe that there was

9  ever an investigation, and correct me if I am wrong, to

10  determine the source of those emails.

11  MR. LEAVIN: Exactly.

12  MS. ZUCCARDY: Actually my information, which is

13  sort of secondhand; but is that there was explanation done

14  through the anonymous website, and all that came back was

15  there was a lot of bounces off different servers. So that

16  it's not able to be proven without significant forensics

17  assessment where they started from. I don't think the D.A.'s

18  office has those kinds of resources, and I certainly don't.

19  MR. LEAVIN: So Judge, to say that he's plead to

20  violating an protection --

21  THE COURT: He hasn't done that yet.

22  MR. LEAVIN: That he said he will plead to a

23  misdemeanor, violating an order of protection against Ms.

24  Lockard. For then for that forensics person to say he

25  shouldn't even observe Mr. Whelan with his daughter to

Case 1:16-cv-09443-PGG-SN   Document 1-5   Filed 12/07/16   Page 9 of 20
Case 3:16-cv-02948-PGS-LHG   Document 6-1   Filed 06/29/16   Page 18 of 24 PageID: 868

PROCEEDINGS

1   determine if there is inappropriate behavior. That is just
2   bizarre. What is the harm to anyone if this so-called
3   Forensics observes Mr. Whelan with his daughter and then make
4   a determination about how he responds.
5           THE COURT: I don't know. But my concern is right
6   now, first of all, there are a lot of variables that are not
7   in place.
8           He hasn't pled which is what you are purporting to be a
9   consideration by this Court. He is not in a program. I
10  understand that on the criminal case a program is being
11  considered. There is a lot of sexualization going on in the
12  context of this case which really is very disturbing,
13  pedophilia, you know, in that range.
14          With respect to these emails, I do not know the source
15  of the emails. It hasn't been proven that your client is the
16  source. But I find it interesting that the emails were sent
17  to the wife to her place of employment. It doesn't seem
18  likely that she would send these types of emails to herself
19  to jeopardize her own employment status. Just in terms of
20  the logical inference is that she would not send these emails
21  to herself to jeopardize her own employment and reputation at
22  her place of work.
23          MR. LEAVIN: She sent them to him.
24          THE COURT: That is an allegation that they were
25  sent to him according to -- and others. So that the emails

PROCEEDINGS

1  was sent to not just her but also her colleagues. The bottom
2  line is this:
3      I'm not going to grant any type of supervision -- any
4  type of visitation at this time, supervised or otherwise.
5  The outstanding allegations are very disturbing. I would
6  like to see your client in a program.
7      The criminal allegations are also disturbing. They show
8  an escalation of your client's behavior, stalking behavior
9  which as we all know is an indicator, a very negative
10 indicator of lethality with respect to that type of behavior.
11     I am also concerned that he is sending emails -- he sent
12 emails to opposing counsel. And the content of those emails
13 were quite disturbing, very disturbing using cursing in one
14 and also acknowledging where Ms. Zuccardy lives and also the
15 hour, 1:48 in the morning or 1:47 in the morning. What he is
16 doing up early in the morning that odd hour sending emails to
17 an attorney that doesn't represent him that represents his
18 wife?
19     There is something very disturbing about his pattern of
20 behavior and it's not just one thing. It's a whole community
21 of issues that are swirling around your client that gives me
22 pause and makes me concerned about reinstating any type of
23 visitation at this point.
24     After he gets himself into a program and he gets
25 engaged, perhaps I will change the order of protection order.

PROCEEDINGS

1   And you have leave to make another application for visitation
2   to resume, but he needs to be engaged in something that is
3   addressing some of these very serious issues and his
4   inability to control himself and the way he is very
5   compulsive. I mean to send emails at 1:47 in the morning to
6   a lawyer that is kind of disturbing. That is a bit
7   disturbing on top of his other behavior.
8           MR. LEAVIN: As I've argued and as you know, they
9   were in direct contact for many months prior to his retaining
10  me.
11          THE COURT: Okay. And now he has a lawyer. He's
12  been in court. It was after his court appearance. He knows
13  that Ms. Zuccardy doesn't represent him. And he knows this s
14  an adversarial procedure. He knows he shouldn't be sending
15  Ms. Zuccardy emails, but he couldn't control himself. He did
16  it anyway. He was up at one something in the morning out of
17  control, angry and decided to fire off a few emails to
18  opposing counsel.
19          MR. LEAVIN: I hear you, Judge. I would just add
20  he's never been violent or threatened violence or been
21  accused of being violent. So I would just ask you to take
22  that into account when interrupting the relationship between
23  their child and the father.
24          THE COURT: He last five pending misdemeanor
25  cases -- five pending cases. I said misdemeanors. I believe

PROCEEDINGS

1   one of them is a felony. He has five pending cases. That
2   show a pattern of escalating, stalking behavior and disregard
3   for court orders, a total disregard for court orders.
4           MR. LEAVIN: I understand the allegations against
5   the mother, against the mother.
6           THE COURT: I understand. All right. I understand
7   that you're objecting to the ruling, but the ruling is what
8   it is.
9           MR. LEAVIN: How about child support, Judge, the
10  financial?
11          THE COURT: I have to issue a written decision
12  regarding that.
13          MS. ZUCCARDY: May I then -- Withdrawn.
14          THE COURT: So let me give you a date.
15          MR. LEAVIN: Judge, can I just say my client has
16  asked you to recuse yourself from the case on the grounds
17  that you're not treating him fairly.
18          THE COURT: Denied.
19          MR. LEAVIN: Thank you.
20          MS. ZUCCARDY: Your Honor, my client has brought to
21  my attention, and I want to make sure it's on record, that my
22  client has been contacted by the I.R.S.
23          Apparently in 2014 there was liquidation of a Vanguard
24  retirement account that Mr. Whelan did not declare on their
25  taxes. So I wanted to put it on the record so that

PROCEEDINGS

1  Mr. Leavin is very clear that this is happening.

2  My client has filed for "Innocent Spouse Relief" and I
3  apologize for not putting that in my oral argument. But we
4  do think it's a factor that that happened without her
5  knowledge and without declaration to the I.R.S.

6  MR. LEAVIN: And, Judge. I have emails from their
7  accountant which is not consistent with what Ms. Zuccardy
8  said. She said it was a mutual problem and there was
9  circumstances where Ms. Lockard refused to contribute to the
10  rent. They discussed and she agreed that he take money out
11  of his retirement fund. This is back in the 2014 joint
12  returns.

13  THE COURT: September 12th at 9:30.

14  MR. LEAVIN: Can we do it any sooner, Judge?

15  THE COURT: I don't have any other dates due to the
16  summer vacation schedules. And also I have a lot of cases on
17  and I really need -- I have an audience full of people right
18  now that have cases that need to be heard. I have a very,
19  very, very busy schedule and I don't have any sooner dates.

20  MR. LEAVIN: I understand, Judge.

21  Just on the visitation issue once he gets into a program
22  and does plead guilty which is presumably going to happen in
23  a couple of weeks --

24  THE COURT: So that will leave time for me to
25  review his progress in the program and see how he's doing in

PROCEEDINGS

1    the program. He would have been in the program hopefully and
2    we'll see how he's doing, progressing in the program.
3    September 12th.
4            MR. LEAVIN: Thank you.
5            THE COURT: September 12th at 9:30.
6            MS. ZUCCARDY: Is that for control or for hearing?
7            THE COURT: Bring your witness lists on that day.
8    I will select fact finding dates at that time and that is for
9    Motion Sequence 3.
10           MS. ZUCCARDY: Thank you.
11           THE COURT: Witness list. With your witness lists
12   just describe your witness's testimony using one or two lines
13   indicating what you hope that you will bring out in their
14   testimony.
15           MS. ZUCCARDY: Thank you.
16           MR. LEAVIN: Thank you.
17   Judge, in the papers my client has asked that Ms.
18   Lockard pay for his medical treatment based on neurological
19   symptoms, brain damages based on violence by Ms. Lockard to
20   him a year ago.
21           THE COURT: I will review the papers and make a
22   determinations with respect to the motion.
23           (THIS SPACE LEFT BLANK INTENTIONALLY)
24
25

PROCEEDINGS

1  MR. LEAVIN: Thank you.

2  MS. ZUCCARDY: Thank you.

3  *  *  *  *  *  *  *  *  *

4  THE ABOVE IS CERTIFIED TO BE A
   TRUE AND ACCURATE TRANSCRIPT OF
5  THE TESTIMONY AS TAKEN BY ME.

6

7

8  *[signature]*

9  AMALIA HUDSON
   OFFICIAL COURT REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:16-cv-02948-PGS-LHG

## Supplemental Arguments

RECEIVED JUL 06 2016 AT 8:30_____M WILLIAM T. WALSH CLERK

1. The logic of my request for reconsideration is two-fold. One reason for reconsideration is that I think the reasons and precedents cited for dismissal are not logically sound. My prior paperwork, as well as item 5 of this document, enumerate my explanations for this part of my reasoning. The second reason is that I believe there has been an inappropriate elision of the bifurcated questions of custody questions and visitation questions. I will describe what I mean in items 6-12. Lastly, I am going to explain that there is no countervailing interest in state court that would justify dismissal or abstention in items 13-18. Summary of the broad logic given in item 19 as conclusion.
2. To clarify the relief I seek, I would like AT LEAST to return to the routine visitation schedule with my daughter delineated in Judge Lori Sattler's Court. In her Court, my wife and I formally agreed that I would pick up my daughter for a visit from 5:00 P. M.-7:00 P. M. on Wednesdays and Fridays AND I would pick her up at noon on Sundays then drop her off with my wife at 6:45 P. M. the same day. There was never any problem or incident with this routine other than that my wife accused me (falsely) of cursing at her during hand-offs. That supposed issue can be remedied by having hand-offs at the local police precinct and/or having one of my family members do the hand-off instead of myself.
3. Ideally, I would simply pick my daughter up from her daycare on Fridays at 5:00 P. M. and drop her off at the daycare on Mondays at 9:00 A. M. That would circumvent the possibility that my wife and I would interact, and I would get to spend an appropriate amount of time with my daughter.
4. AT THE VERY LEAST, supervised visitation at the CFS facility, which I was allowed from January-March of 2016, should be restored. There was never any incident or problem with those visits.
5. Against the citation of the Colorado water rights case as basis for relegating this case to state court, the ruling on May v. Anderson 345 US 528, 541 states, "The difference between a proceeding involving the status, custody, and support of children and one involving adjudication of property rights is too apparent to require elaboration." I am appending the entirety of that proceeding to this filing.
6. I am not asking that the District Court get involved in making a custody decision. The question of custody, in the legal sense, has fallen by the wayside because I have had to fight tooth and nail for routine visitation rights.
7. My struggle for a rational visitation routine began in the summer of 2015 when my wife and I were separated. Her neurosis led to increasingly strict requests, including that I use a breathalyzer when I picked up my daughter to show her that I had not been drinking AND requiring the presence of one of my family members during the visit. Her strictures

    became so absurd that I went to Family Court to file an OSC to normalize visitation. This was before I had retained counsel.

8. As I was organizing my paperwork in the New York State Family Court waiting area, Jill Zuccardy, my wife's lawyer, happened to call me. I described what I was doing to Ms. Zuccardy, and she said that, while she did not know exactly what I was filing, I should not file anything until I had sought legal counsel. She effectively advised me against filing the OSC, and thereafter Ms. Zuccardy and my wife intensified their efforts to restrict my visitation privileges.

9. There never was any incident where I endangered nor neglected my daughter. Knowing this, and realizing that my wife has a mental health history including psychosis, Judge Lori Sattler's Court eventually instituted the visitation routine described in item 2 above.t This was done against the wishes of my wife and Ms. Zuccardy because of nebulous fears for my daughter's safety. Their concerns have remained nebulous and unspecified, although my lawyer has repeatedly asked Ms. Zuccardy what they fear and what would alleviate those fears.

10. Essentially all of the cases that I cite concerning parental constitutional rights use the term "custody" with reference to constitutional protections. There is, as I mentioned in item 1, an ambiguous usage of the term "custody" that encompasses visitation AND parental contact. I am not even asking for a technical custody order. All I am asking is that I be allowed to have routine visits with my daughter for her sake and for mine.

11. Wild accusations abound in divorce hearings. If those accusations are allowed to be grounds for child deprivation, then every child whose parents are getting divorced ought to be put into foster care indefinitely. There has never been any allegation of child endangerment nor of child harm nor of child abuse against me that was found to be legitimate.

12. In the Interest of Cooper, 621 P 2d 437; 5 Kansas App Div 2d 584 states that a parent who is deprived of custody of his or her child, even temporarily, suffers thereby grievous loss and such loss deserves extensive due process protection. I have not been granted any due process protection, and yet Judge Dawson says she will only reconsider whether or not I can have contact with my daughter on September 12, 2016. I have not seen my daughter since March 2016.

13. Just as my rights are being violated, Judge Dawson is routinely violating the constitutional rights of the people who enter her court in similar ways according to anecdotes I have heard.

14. Technically, a countervailing interest is supposed to be equal and proportionate to be considered countervailing. In tort law theory, the concern for a child's safety and the concern for preservation of the parent-child relationship can be countervailing interests IF the parent abuses the child. HOWEVER, I have never abused my child nor have I ever neglected my child nor have I ever even endangered my child.

15. The only countervailing interest against the preservation of the parent-child relationship in my situation is the hysteria that my wife presents to Judge Dawson's court. Having no correlate with anything in objective reality, that hysteria is either grounded in paranoia or vindictiveness. Since the countervailing interest has not been subjected to due process nor could it be.

16. In Judge Dawson's court, Ms. Zuccardy spouts false narratives that my mentally ill wife has cast over her memories. These false, unproven narratives are either born of vindictiveness, the desire to control visitation because my wife's control issues, or the fact that my wife cannot live with the shame of having been an abusive spouse that endangered our child with her abuse and mental illness. Frankly, it does not even matter why they propagate unproven, unproveable, and mostly uninvestigated (the one accusation that was investigated was ruled unfounded) accusations. What matters is that Judge Dawson believes the accusations and has taken away my constitutional right to my parent-child relationship without any effort at a swift due process hearing to justify doing so. Her plan is to re-assess on September 12, 2016.

17. If the unproven paranoiac projections of a person with a history of psychosis are a countervailing interest in this case, AND that countervailing interest is considered a grounds for dismissal of my plea to reclaim my constitutional right to my daughter's and my parent-child relationship, then I am genuinely confused about how our court system is fulfilling its mandate of upholding the constitutional rights of American citizens. The denial of personal rights out of excessive concern for safety is generally not supported by the spirit of the law nor historical rulings of the upper courts. In fact, such deprivation of rights without due process is generally explicitly denounced by Supreme Court justices.

18. Furthermore, denial of contact with a parent is known to cause life-long psychological damage to a child. Nominally, my daughter's safety is the countervailing interest that might be cited as grounds for the District Court to dismiss or abstain from considering this case. I grudgingly abided the paranoid restriction of visitation to the CFS supervision facility from January-March of 2016 before visitation was disallowed altogether. Not only that, the supervisory staff found my parenting to be proficient. Disallowing parental contact NOT ONLY has no countervailing interest grounds BUT ALSO shows that in fact deprivation of the parent-child relationship is demonstrably harmful more than helpful.

19. Congress will not even agree to restrict Second Amendment rights of individuals who are on the No-Fly-List because being added to that list does not require a due process hearing. Is it more meaningful to our government to maintain the right to gun ownership than the right to a parent-child relationship? There is no grounds for dismissal nor for abstention of the upper courts in this situation of ongoing constitutional rights violation.

*I certify the truth and accuracy of these statements.*   X Steven Whelan   7/6/2016

Steven Whelan

# EXHIBIT B

Details of Complaint

Judge Dawson has acted in violation of Article 28 of U. S. Code 455 subsections (a) and (b)(1). She has demonstrated certainty about disputed evidentiary material facts in the cases. She has shown in her words and orders that she believes me to be guilty of untried allegations based on the hearsay of the Plaintiff and Ms. Zuccardy (Plaintiff's counsel) that I deny.

The criminal and family court cases were consolidated into Judge Dawson's Court and heard there for the first time in January of 2016. Based on unproven non-violent contempt of court claims (the substance of which was that I had accidentally passed the Plaintiff on the street twice) AND false, unproven allegations that I am an irresponsible driver AND false, unevidenced claims that I had have endangered and neglected my daughter AND false claims about my home being an unsafe environment for a child AND claims that I am an alcoholic AND their allegation that I had made a frivolous ACS complaint against the Plaintiff, Judge Dawson ordered my visits with my daughter limited to Comprehensive Family Services visits for a maximum weekly four hours. Plaintiff and her attorney, Jill Zuccardy, failed to evidence the claim that I am an unsafe driver because I have not been at fault in an accident for the past 15 years despite driving almost every day, sometimes for hours around New York City. A woman from Deyfus was sent to report to ACS on the safety of my home, and she affirmed that it is a safe environment for my one year old daughter to visit. The contempt of court charges are still pending disposition on October 11, 2016. Judge Dawson first postponed my plea deal multiple times starting on April 1, 2016. I am not an alcoholic, and their argument to the contrary is

1