refuted by various professionals and organizations such that even Judge Dawson recognizes there is no legitimacy to the claim of alcoholism. The ACS complaint I made against the Plaintiff was not thought by either ACS or Manhattan SVU to be frivolous. Although the Plaintiff was not indicated by ACS, the weight of concern about my daughter's safety was lifted from me (I'm also appreciative that she is now under increased scrutiny by other people in our daughter's life). The reckless driving and alcoholism claims were strangely commingled into claims that I regularly drive while intoxicated, although Ms. Zuccardy has had to give up this claim due to lack of truth and lack of evidence.

The supervised visitation routine continued thereafter until my the last time I saw my daughter on March 24, 2016. The visits went well and I was observed to properly care for my daughter. I left while crying when I found my one chance to see my daughter the week before had been cancelled without CFS notifying me. I silently, without even looking at them, exited past the Plaintiff and my daughter when Mariah Ely, the CFS employee, asked me to leave. I did not hear her say that I was supposed to leave through the other door, which now Ms. Zuccardy and the Plaintiff take as indicating a violent lack of impulse control. This is a common theme that Judge Dawson finds very sympathetic - I am upset about not being able to see my daughter, I exit the situation harmlessly, and Ms. Zuccardy sends panicked emails to Mr. Leavin which she echoes in Judge Dawson's Court. It had already been emotionally painful for me to have my visits restricted to such short hours and for them to have to take place in that terrible setting of the CFS facility. Things have gotten so out of control now, though, that Mr. Leavin has had to request a

hearing on allowing me to even have CFS supervised visitation. The fact that supervised visits were suspended by Judge Dawson is beyond outrageous.

Ms. Lockard has repeatedly initiated frivolous contempt of court claims alleging that I violated the Temporary Orders of Protection ("TOPs" hereafter). The intent of a TOP is to protect someone from danger, but I never posed a danger to the Plaintiff. In fact, the Court record now includes Affidavits from me, medical records, and psychological history records from the Plaintiff's treatment which together evidence the fact that the Plaintiff gave me concussions by punching me in the head. On the first appearance in Dawson's Court in January (after the case was moved from Judge Sattler's Court due to the alleged TOP violations), I included my first two months of treatment records. I referenced those records in Motion Sequence 4, and I offered to provide a the more recent records if desired. Yet Judge Dawson's Decision and Order on Motion Sequence 4 signed on July 12, 2016 states on page 2, "The defendant has provided no competent credible evidence indicating his diagnosis, treatment, or prognosis of his purported health issue." She looked only at the appended Exhibits filed with that request for *pendente lite* reduction, but this quote show that she is unaware of the prior submission to her Court of the first two months of my treatment records.

On September 12, 2016, I furnished the up-to-date records to the Court and I have noted on multiple occasions that any questions about my post-concussion disorder and its treatment can be answered by myself or Dr. Vincent Kiechlin, the doctor who treats me. This treatment has been long, difficult, and cost thousands of dollars. Please observe that I am not accused of committing

3

any violence but everyone recognizes the fact that my wife hit me in the head violently enough to give me a debilitating vestibular post-concussion disorder. Bringing frivolous TOP violation charges has successfully diverted Judge Dawson's attention away from the Plaintiff's history of committing domestic violence.

Before I went to see Dr. Kiechlin, I was getting severe migraines, having double vision, was developing both a lisp and a stutter, and I had difficulty walking without falling down. These symptoms were an intensified version of symptoms that I had first notice the day after the Plaintiff first knocked me unconscious by hitting me in the head in May of 2014.

Judge Dawson has now seen psychological records corroborating that Ms. Lockard punched me in the face as well as records of my treatment for a vestibular disorder that can only be explained by head trauma. She expresses no interest in gaining a fuller understanding of my neurological damage. Her disregard of the facts of the case evidenced in her remarks evidences violation of 28 U.S. Code § 455(a) "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned" AND subsection (b)(1) insofar as it demonstrates a "personal bias."

Part of the January 2016 orders made by Judge Dawson included suspending my ability to visit my daughter's daycare. Parents are encouraged to visit the daycare and participate in group activities with the children, and Judge Sattler had previously ordered that I had permission to visit the daycare once a week to bond with my daughter. I had done so several times and there

was never any incident, yet Judge Dawson suspended my permission to continue participating in my daughter's life by visiting the daycare. The Plaintiff and Ms. Zuccardy had requested said suspension on nebulous grounds, claiming that it was too complex to coordinate with Rockefeller campus staff (within which the daycare is housed) and that I am "unstable." Despite the fact that I have had no criminal history and I have never committed any act of violence, Judge Dawson, the Plaintiff, and Ms. Zuccardy speculate together that I am bound to commit some sort of violence. The only basis for this concern is the hearsay of the Plaintiff and Ms. Zuccardy, unevidenced and unproven, expressing concern about my impulsivity.

On April 1, 2016, the Plaintiff and Ms. Zuccardy made a laundry-list of accusations, including accusations that I had menaced Ms. Lockard by passing her in the CFS waiting room (a claim that they have since recanted after I pointed out in an Affidavit that the claim would be easily be disproven with video evidence) AND accusations that I had sent perverse, sexually explicit emails with links to a literary erotica website to acquaintances of the Plaintiff.

Judge Dawson decided to suspend visitation at that time altogether, saying she wanted to wait until the District Attorney sorted out who had sent the emails (which appeared to have been sent by the Plaintiff yet Ms. Zuccardy and Ms. Lockard speculatively suggested that I had sent). I denied and continue to deny sending the emails. Knowing that I was already having emotional difficulty being restricted to so little time each week with my daughter, my attorney Mr. Leavin argued that Judge Dawson should wait until it was proven that I had sent the emails before suspending visitation. She nevertheless granted Ms. Zuccardy's request to suspend visitation.

5

Since then, Ms. Zuccardy has said on the record that the District Attorney could not determine where the emails had originated, and so I would not be charged. Nevertheless, Judge Dawson did not allow visitation to resume and demonstrably still believes the speculative allegation that I sent the emails.

Let me explain here why I believe Judge has already, in her mind, decided that I sent the emails in question. This is important because she is tasked with approving my plea deal in the criminal disposition AND then to fairly adjudicate the civil contempt proceedings. The Plaintiff and Ms. Zuccardy have included the allegation that I sent the emails in a civil contempt suit that is supposed to be tried by Judge Dawson after the criminal contempt proceedings have been completed. However, at my criminal disposition hearing on April 23, 2016, Judge Dawson postponed my plea hearing to another date because she was not happy with the program that the District Attorney and my lawyer in the criminal proceedings, Mr. Brostowin, had agreed upon. The plea entailed my getting counseling at the PAC program. When Judge Dawson heard this, she asked that counsel approach the bench. She said that the PAC program was not appropriate because it is a substance abuse program and I do not have a substance abuse problem. She told them that there were "concerns about pedophilia," a remark that was off the record but I was able to hear. This is first of all slanderous as I have never even been accused of pedophilia. Second of all, none of the criminal charges are even remotely related to pedophilia NOR do any of the charges allege any sexual impropriety, violence, or harm towards anyone. The only conceivable basis her to make this remark is that she believed the claims, denied by myself and Mr. Leavin, that I had sent the emails in question that had links to perverse erotica. Even the sending of such

emails, which the Plaintiff has been known to send in the past, would not be evidence of pedophilia. FURTHERMORE, she once again blocked my plea to attend the ABS program in Brooklyn at the September 12, 2016 disposition hearing. Once again, she told the D. A. and Mr. Brostowin, after they had approached the bench, that whatever program I did needed to included a sexual disorder treatment component. On both occasions, Mr. Brostowin remarked that none of the charges included anything remotely sexual. Judge Dawson has apparently decided that I need to be punished for hearsay claims from the divorce proceedings in my criminal sentencing. Mr. Brostowin suggested an anger management group counseling program, but Judge Dawson also did not feel that would be satisfactory. On the record, Judge Dawson went on to say that she wants the D. A. to make sure that I whatever program they decide upon is satisfactory to Ms. Lockard, the Plaintiff in the divorce trial. The D. A., Judge Dawson's Court, and Ms. Lockard are supposed to be coordinating on a program suggestion right now. The disposition was once again postponed for October 11, 2016. She continues to slanderously allege that there are concerns about pedophilia when the D. A. has even admitted that there is no hard evidence that I sent the emails with the links AND whoever sent them is not necessarily engaged in pedophilia. I do not think that Judge Dawson even understands the content and meaning of the unevidenced allegations that I sent the perverse emails.

IN ADDITION, my daughter was arbitrarily added to a TOP in arraignment court after one of my arrests. Mr. Leavin and I have argued to Judge Dawson that my daughter should be removed from the TOPs because there is no allegation of harm or threat towards my daughter. There was never any logical justification for such a restraining order because I have never harmed,

threatened, nor neglected my daughter, and yet Judge Dawson cannot be bothered to consider the facts of my case.

ADDITIONALLY, Mr. Leavin and I demonstrated that I received emails with threats prior to the perverse emails being disseminated. In these earlier emails, which are in the Court record, the Plaintiff appears to threaten to frame me and and put me in jail indefinitely if I do not voluntarily relinquish my rights to visitation. These emails were likewise sent through a website and had unclear origin. They seemed to designed to lack credibility because they were so over-the-top in their aggression, including threats to kill me. However, the threat to prevent me from having visitation by making false accusations (that I had sent the perverse emails) came true AND Ms. Zuccardy is requesting jail time in the civil contempt cases that have since been initiated (putting me in jail if I was non-compliant was one of the threats made by the Plaintiff in the emails I had received). The Plaintiff denies sending me the threatening emails, yet the threats to prevent me from seeing my daughter by means of made up accusations has come true through Judge Dawson's Court AND Ms. Zuccardy not only requested that I be remanded pending the civil contempt hearing, Ms. Zuccardy and Ms. Lockard do everything they can to have me jailed. I am a non-violent person, yet after sending a non-threatening email to someone else that the Plaintiff supposedly received as a carbon copy, an email in which I did not even address the Plaintiff, the Plaintiff decided to have me arrested again. I was home in New Jersey at the time, and the police arrested me several days later in court, whereupon I spent 27 days in jail hoping to have had a disposition completed. However, the bus from Riker's Island was late to the disposition hearing and so the disposition hearing was postponed another month (my family

8

decided to borrow money to bail me out). By accepting unproven hearsay as fact for the sake of the criminal disposition, and in the various other activities described above, Judge Dawson has violated both 28 U.S. Code § 455(a) and 28 U.S. Code § 455(b)(1) not only in the ways already set forth, but also in acting as though she has "knowledge of disputed evidentiary facts concerning the proceeding."

Mr. Leavin has repeatedly asked Ms. Zuccardy and Judge Dawson under what circumstances they would be comfortable normalizing visitation. They have provided no clear-cut answers. Judge Dawson agreed to have a hearing on resuming supervised visitation on November 16, 2016, but because of her irrational caution I doubt she will grant the request. Violent criminals who have even abused their children are allowed to see those children in supervised settings. I have never committed an act of violence NOR have I ever threatened to commit an act of violence NOR am I even accused of either.

I understand that a preponderance of evidence is sufficient in a civil hearing, but there is no evidence that I sent the perverse emails. Ms. Zuccardy cited only "circumstantial" evidence when accusing me of sending those disgusting links. *Cui bono?* It have lost my job because of the frivolous contempt charges and my post-concussion disorder. The difficulty of my recovery has been compounded by every jail stay. The Plaintiff is essentially continuing her abuse from afar when she knows there is no danger to her or anyone else from me. Judge Dawson is not supposed to suspend constitutional rights based on a preponderance of evidence, and Federal Courts have repeatedly stated that the right of a parent and child to the society of each other is a

constitutional right protected at least by the 1st, 5th, 9th, and 14th amendments. While the state constitution of the State of New York gives judges leeway to suspend visitation when doing so is necessary to protect the child, it is manifestly unnecessary in this case. I am pursuing that issue in the Federal Courts, and my filings have been appended to Affidavits in the divorce proceedings, so I will not detail the nuances of that problem here. The issue at stake in this filing is that Judge Dawson has violated federal judicial statutes by not objectively and fairly adjudicating and cannot be expected to objectively and fairly adjudicate on any of my cases going forward.

Imagine a woman had a sprained ankle and her husband hit it various times over the course of a year. The injury gets so bad that it requires almost a year of rehabilitation. She never commits any act of violence towards him. Then, the husband gets an *ex parte* TOP and seeks out frivolous reasons to have his abused, recovering wife arrested repeatedly. Her recovery is not only slowed but the injury deteriorates every time he is in jail. She has never committed any violence and never threatened any violence. What judge on Earth would give the husband a temporary custody order and prevent the mother from seeing her daughter? With the genders reversed and traumatic brain injury in the place of the ankle injury, Judge Dawson has made such a decision. She has decided to torment me, although I am a victim of the Plaintiff's spousal abuse, at the expense of my daughter's having a relationship with her father. Just as she seeks to use the criminal disposition as an occasion for punishments unrelated to the charges, punishments for types of crimes I've never committed NOR thought of committing NOR am I even accused of committing by anyone (even the civil contempt charges do not allege sex

crimes), in the same way the deprivation of society between myself and my daughter comes across as Judge Dawson exercising the liberty of her office to punish me for conjecture presented by the Plaintiff and Ms. Zuccardy. By twice postponing the disposition plea based on her concerns about uncharged, unevidenced conjectural allegations, Judge Dawson is clearly trying to exceed the punitive sentence that would be commensurate with the charges. I overheard first thing Judge Dawson expressed off-the-record when counsel approached the bench on September 12, 2016: "Six months out-patient? That's all you're asking for? These are A LOT of charges." In saying that with a tinge of anger, Judge Dawson revealed that the plurality of the charges has blinded her to the trivial content of those charges AND the fact that many (if not all) of the charges could not stand up to the scrutiny of trial[1] AND that a sentence post-trial is likely to be even less punitive than the one on offer.

In support of this claim is the fact that Judge Dawson and Ms. Zuccardy have found precisely one professional to recommend deprivation. Dr. David Gerard of Mental Health Services, to which my wife and I were referred, was interviewing the Plaintiff and I during the same week that the perverse emails were emerging in March 2016. The Plaintiff told Dr. Gerard that I had once gotten drunk and let my daughter fall off of a chair. This was brought up by Judge Dawson in the April 23, 2016 hearing when she decided to suspend visitation altogether. Mr. Leavin

---

[1] For the September 12, 2016 disposition hearing, the District Attorney told Mr. Brostowin that he would ask for me to be remanded if I pled "Not Guilty." However, the D. A. did not ask for me to be remanded when the disposition was postponed. This shows that the D. A. does not actually believe I am dangerous but hoped the threat would prevent me from taking the charges to trial. This particular incident would lend itself well to an abuse of process case against the D. A., the Plaintiff, and Ms. Zuccardy, but I would obviously need to bring that in another forum rather than through the Commission. That is a procedure I am researching now as well.

11

pointed out on the record that the Plaintiff had not been present during the alleged incident, that in the ACS report (which the Plaintiff's counsel acquired before the indication of intoxication was overturned), I was not accused of letting my daughter fall off of a chair. In fact, it was not indicated that I even endangered my daughter. My daughter fell sideways in the Weill-Cornell Presbyterian psychiatric emergency room, and observed that she would was safe and had plenty of room to breath, so I decided to put down the burrito I was eating and wipe my hands before picking her up. A social worker grabbed my daughter, said that that was dangerous, and took her away. She accused me of being intoxicated, but this was never substantiated.

The ACS investigator said she could not tell from the witness reports if I was drunk or stressed out - at the time on April 18, 2015, the Plaintiff had had a nervous breakdown, tried to kill herself in multiple ways, and tried to stab me (all of which is noted in the same ACS in the Court record). I was extremely stressed out at the time because I had not gotten an update on my wife, was not allowed to see her (standard procedure in a psychiatric waiting room), and I had been there for several hours. Incidentally, I know now that post-concussion disorder symptoms are aggravated by stress. So, after the Plaintiff tells Dr. Gerard that I got drunk and let my daughter fall off of a chair onto the floor, Dr. Gerard accepts it as true despite the fact that I denied it AND no one who was present even claimed that my daughter fell off of the chair, AND THEN Judge Dawson reads Dr. Gerard's recounting aloud in Court on April 23, 2016. Mr. Leavin explained Judge Dawson that this is not an accurate account, and the following exchange ensued (I have a copy of the transcript):

12

THE COURT: Also contrary to your assertion that he's never harmed the child in any way, in the same mental health eval, it says that he went to a hospital and appeared drunk to hospital staff. He smelled of alcohol and was stumbling. He also tried to prop up five-month-old Willa who wiggled and fell off the couch. Hospital staff took her to the pediatric ER and reported Mr. Whelan's behavior to Child Protective Services.

MR. LEAVIN: Judge, as is on the record when Mr. Whelan met further with ACS submitted documents and explained the situation, that report was considered, was overturned, was reversed, and was considered sealed as unfounded.

THE COURT: What does that mean? That these facts never occurred? The child didn't fall off of the couch and he was not drunk with Willa in the hospital?

MR. LEAVIN: That's only what Ms. Lockard said.

THE COURT: Ms. Lockard wasn't there. Wasn't she admitted to the hospital?

MS. ZUCCARDY: Yes.

MR. LEAVIN: What she said to ACS subsequent. He said three hours before he had one beer. And now the allegation - the ridiculous allegation that he was drunk three hours later.

THE COURT: This is odd then. Here is another example that supports Ms. Zuccardy's theory that he doesn't take responsibility because in here it says, "He appeared drunk to hospital - according to hospital staff." Let me just see here.

MR. LEAVIN: Judge, ACS in their reversal of these conclusions he was never tested for alcohol when at the hospital when he supposedly was holding Willa. He was never tested. And based on all of the evidence ACS reversed this finding - these allegations.

13

I will briefly go over the basics surrounding the four arrests that had occurred at this point when Judge Dawson claimed an escalation indicative of "lethality" risk was occurring.

The first contempt charge was a Misdemeanor A alleging that I handed my wife a shoe of our one year old daughter after finding it on the street. I admitted this to the arresting officer, thinking it would be dismissed as an unintentional violation of the TOP considering the fact that I immediately turned and walked away AND I in fact made this gesture out of kindness rather than resentment[2].

The second arrest included four counts and was again classed as a Misdemeanor A, alleging the following:

---

[2] A week before, I had lost one of my daughter's yellow Croc shoes when I had her out to dinner by myself. Willa had a tendency at that age, just over a year, to pull her shoes off while being pushed in the stroller. I did not notice, when returning from the restaurant, that she had lost a shoe. A series of irate emails were hurled at Mr. Leavin by Ms. Zuccardy. The Plaintiff and Ms. Zuccardy alleged that I had intentionally taken the shoe out of spite. I had a new pair yellow Crocs the same size shipped to her from amazon.com. So, the fact that I had found a shoe which the Plaintiff had dropped and that I had in my pocket could have been an occasion for me to exercise vindictiveness. Instead, when we bumped into each other on the street corner, I thought that there was no reason for me to hold the Plaintiff's senseless accusatory tendency against her at the expense of our daughter's footwear. This was less than an hour before my scheduled noon Sunday pick-up of Willa and I had arrived to the neighborhood early, accounting for the unpredictability of traffic on the drive from East Brunswick, NJ to the Upper East Side. I assumed that the Plaintiff had dropped the shoe on the way to 10:00 mass, which she said she was routinely attending at our Parish and was the stated reason why I could not pick up Willa before noon. So, I picked it up and started walking to the park to pass the time. The Plaintiff and I met on a blind corner, I did a quick calculation of the risk/reward in my head, and decided to hand the Plaintiff our daughter's lost shoe before walking away silently. The arresting officer admitted that it was absurd, but my having handed the Plaintiff the baby shoe was a technical violation of the *ex parte* TOP.

1. I sent the Plaintiff a message on December 21, 2015, saying, "(Hope you're having a good day) Happy anniversary, sweetheart." The Plaintiff had told the police this, but she cites only circumstantial evidence that it was from me and there is no hard evidence.

2. The Plaintiff claims to have "observed" me outside her apartment building on December 26, 2015. Again, there is no evidence of this charge and it is in fact impossible for me to be "outside" of the Plaintiff's apartment building because she lives on a secure compound that requires a magnetic key-card for entry. There is no way to access that building without being on the campus. Even at the named cross-street, there is a security guard constantly monitoring the gates, a series of three electronic doors that each require electronic key-cards for access to her apartment building, and security cameras throughout the entranceways. Also, according to an extrapolation from a message she had sent my mother (who was coordinating the visit arrangements at the time), the Plaintiff was not even in Manhattan at the time of the complaint. Even IF I had been nearby, I had no possible way to access her building, the Plaintiff was supposedly travelling back from Western Pennsylvania at the time, and there is no accusation of harassment nor of violence.

I have explicitly denied all of the claims from the third arrest. Those charges were categorized as Criminal Contempt in the Second Degree, 3 counts, alleging that:

1. I called the Plaintiff on the phone and asked, "Can we call it a truce? Why did you have me arrested?" The Plaintiff has provided no evidence of these phone calls that I know of.

2. I called the Plaintiff on 8:47 A. M. on January 6, 2016. This accusation, like the others in this third arrest, blindsided me. I made no such phone call.